UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------x

UNITED STATES OF AMERICA, :
PLAINTIFF, : 12CR50
:
versus : United States Courthouse
: 225 Cadman Plaza East
: Brooklyn, N.Y. 11201
ANTHONY ROMANELLO, also known :
as "Rom," :

: NOVEMBER 26, 2012
DEFENDANT. : 9:30 a.m.

-------------------------------x

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE CAROL B. AMON
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:

LORETTA LYNCH
United States Attorney
BY: JACK DENNEHY, ESQ.
Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

For the Defendant:

GERALD J. MCMAHON, ESQ.
MATTHEW J. MARI, ESQ.

Court Reporter:
Charisse Kitt, CRI, CSR, RPR, FCRR
225 Cadman Plaza East Rm N357
Brooklyn, New York 11201
Tel: (718) 613-2606
Fax: (718) 613-2696

Proceedings recorded by mechanical stenography, transcription by computer-aided transcription.

MR. DENNEHY: Your Honor, the Government calls Joseph Massino.

THE COURT: All right.

COURTROOM DEPUTY: Please stand and raise your right hand.

JOSEPH MASSINO, called by the Government, having been first duly sworn, was examined and testified as follows:

THE WITNESS: Yes, I do.

COURTROOM DEPUTY: You may be seated.

Please state and spell your name for the record.

THE WITNESS: Joseph Joseph Massino. M-a-s-s-i-n-o.

MR. DENNEHY: May I inquire.

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. DENNEHY:

Q Mr. Massino, were you ever a member of the Mafia?

A Yes, I was.

Q Which family?
A The Bonanno Family.
Q For how many years were you affiliated with the Bonanno Crime Family?
A Since 1972.
Q Until when?
A 2004.
Q What was the highest position you ever held in the Bonanno Crime Family?
A Boss.
Q Was there anybody higher than you?
A No.
Q What happened in 2004?
A I went to trial.
Q And, after trial, were you convicted by a jury of seven counts of murder?
A Yes, I was.
Q And did they enter a judgment against you to pay over $10 million in fines for the crimes you had committed?
A Correct.
Q And thereafter, did you make a decision?

MR. McMAHON: Judge, I object to leading.

THE COURT: I think, on these preliminary matters, Ill overrule the objection.

Q Did you decide to do something after that?

A Yes, I did.
Q What was that?
A To cooperate.
Q With the Government?
A Yes.
Q In the Mafia, what's the penalty for cooperating with the Government?
A Murder.
Q Are you currently in prison?
A Yes, I am.
Q Since when?
A 2003, January.
Q And, in addition to prison, are you in the witness protection program?
A Yes, I am.
Q Do you see anyone else in the courtroom who is a member of the Mafia?
A Yes, I do.
Q And who is that?
A The man sitting over there with the glasses, Romanelli [sic].
Q What's his first name?
A I believe its Anthony.
Q With which family do you know him to be affiliated?
A The Genovese Family.

Q Where were you born?
A Queens.
Q And where did you grow up?
A Queens.
Q At what age did you begin committing crime?
A 12 years old, 13 years old.
Q What types of crimes did you commit?
A Rob pigeons, stole a car, go for a joy ride.
Q Were you arrested for those crimes?
A Yes, I was.
Q Did you do any significant jail time?
A Not at all.
Q When you were 14, what did you do?
A Ran away went to Florida.
Q How did you get there?
A Hitchhiked.
Q How long did it take to get there?
A About three months.
Q Were you arrested along the way?
A Yes, I was.
Q For what types of crimes?
A I got locked up in North Carolina for vagrancy, and I got locked up again in Lake City, Florida for vagrancy.
Q What was the punishment?
A Couple days in jail down South.

Q For about how long did you stay in Florida?
A I came back in June.
Q Of which year?
A 1958.
Q What's the highest degree of education you have?
A 8th grade.
Q When you came back to New York City, what did you start to do with yourself?
A When I came back from Florida?
Q Yes.
A I went back to school.
Q What type of school?
A I went to P.S. 73. Then I was 16, I went to Queens Vocation.
Q Did you actually go?
A Yes, and I quit.
Q What's the highest grade you finished?
A 8th grade.
Q Did you begin having regular jobs?
A Yes, I did.
Q What types of things?
A I was working for a cardboard factory making boxes.
Q And, after that, what was the progression of jobs that you had?
A After that I got married.

Q At what age?
A I got married at 17.
Q Are you still married to that woman?
A Yes, I am.
Q What's her name?
A Josephine.
Q When you and she were first married, what types of jobs did you hold?
A I worked for Taystee Bread. I started Taystee Bread, then, two years later, I got a truck and I went out and I served factories, gas stations, junk yards. I built up a route, coffee truck.
Q While you were serving coffee and sandwiches on those various stops, were you also committing crime?
A Yes, I was.
Q What were you doing?
A Robbing trucks off gas stations, taking numbers.
Q Did there come a time when you got arrested at a young age for hijacking?
A Yes.
Q What happened with the case?
A It got thrown out.
Q How did that come to be?
A Well, the guy went in to go eat and somebody stole a trailer. When they were driving, I passed and I spotted the

agents. So I pulled alongside the trailer and alongside the street and told them, youre being followed by the FBI. He made a right, I got lost, I come back and they locked me up.

Q What were you charged with?

A I think possession of a stolen truck, it wasnt hijacking.

Q Was that in federal court?

A Yes, it was.

Q Did you lie in court to get out of that charge?

A Yes, I did.

Q Tell the jury what you did.

A I got on the stand, they wanted to know why I cut the trailer off. I was on the wrong side of the street. I said he cut me move. So I pulled up alongside of him and I was cursing at him.

Q Really, he was in the hijack; right?

A Yes I was. It wasnt hijacking, it was stolen truck.

Q You were tipping off the driver that of the FBI was there?

A Yes.

Q Instead, you told the Court that you were cut off and yelling at the guy for cutting you off?

A That's correct.

Q What happened to that charge?

A It got thrown out.

Q Did you ever commit bribery to get out of an arrest for a

charge?
A Yes, I did.
Q Tell the jury what you did?
A I got arrested for policy, which is numbers, and I paid $5,000 to get it squashed. I got arrested for stealing suits, paid $20,000 to get it squashed.
Q Did there come a time when you met members of people affiliated with organized crime?
A Yes, there was.
Q Approximately when was that?
A 1972.
Q And who was it that you met?
A Phil Rastelli.
Q Who was he?
A He was the Boss of the Bonanno Family.
Q How did it come to be that you became acquainted with him?
A His nephew was my good friend and I got him a route for my uncle serving factories, catering truck. So he told his uncle, I want you to meet my friend Joe. Brought his uncle to my deli, I met him, and I was with him ever since.
Q Until 2004, when you decided to cooperate?
A Correct.
Q What's the most serious crime you ever committed with the Bonanno Crime Family?

A Murder.
Q How many?
A Twelve.
Q What other types of crimes did you commit in your affiliation with the Bonanno Crime Family?
A Bookmaking, breaking and entering into a factory.
Q What is shylocking?
A Shylocking, Poker-Joker machines. Shylocking is when you give somebody money and you charge them vig.
Q What is vig?
A The interest.
Q If you don't pay the vig, what do you do?
A Give them a beating, threaten them.
Q As you became affiliated with the Bonanno Organized Crime Family, what was your position in the Family in the beginning?
A When I begin?
Q Yes.
A I was an associate.
MR. DENNEHY: May I approach the witness, your Honor.
THE COURT: Yes.
(Approaching the witness.)
MR. DENNEHY: Showing the witness Government Exhibit 1 for identification.
(Approaching the witness.)

(Showing the witness.)
Q Do you recognize this chart?
A Yes, I do.
Q What is it?
A Its a chart of how the mob operates.
Q Does it show the various positions and the different categories of position in organized crime?
A Yes, it does.
MR. DENNEHY: I offer Government 1.
MR. McMAHON: No objection.
THE COURT: One is received.
(Government's Exhibit 1 was received in evidence as of this date.)
EXAMINATION BY
MR. DENNEHY:
(Continuing.)
Q First of all, how many crime families are there in the New York City area?
A Five crime families in New York.
Q What are they?
A The Bonanno, the Genovese, the Luccheses, the Colombos, and the Gambinos.
Q Do they all have a structure?
A Yes, they do.
Q And is the structure of each family substantially the

same?
A All the same in all the five families, yes.
Q Who is at the bottom of the chart in terms of the hierarchy of organized crime?
A On the bottom of the chart?
Q Yes.
A Associates.
Q And what does it mean to be an associate of organized crime?
A Associate means youre not a wiseguy or a made guy. Youre around the wiseguy.
Q Can any person become an associate of organized crime?
A Pretty much so.
Q Do you have to be a man?
A No, not really.
Q Are there ethnic requirements to be an associate of organized crime?
A Yes.
Q As an associate before you get made?
A Correct.
Q And, generally speaking, what are the responsibilities of an associate in organized crime, someone who is not made?
A You got to be -- before you do anything, or whatever youre doing, you put it on record. If youre with a soldier, or if you're with a captain, or if you go with the underboss

or boss. It all depends who youre with. Whatever you do, you got to put it on record.
Q And for what purpose is that?
A They want to know what's going on.
Q And, in general, what is the purpose of the Mafia?
A Its all about money.
Q And how is money earned?
A All different ways -- shylocking, bookmaking, gambling, hijacking, drugs, unions, newspapers.
Q When youre in the Mafia, do you have regular sources of income, legitimate income?
A Yes.
Q And from crime?
A Excuse me?
Q And from crime as well?
A Both.
Q And how does the Mafia get people to part with their money for those various schemes that you've just explained.
A It all depends. If youre doing something illegal, you kickback. If you got a legitimate business, you kickback.
Q Does the Mafia use violence and the threat of violence to collect money?
A All the time.
Q How so?
A You don't pay, put you in the hospital.

Q If someone who is an associate of a family, lets say, the Bonanno Family, how are they referred to?
A He's a friend of mine. If he's an associate around me, and I would introduce him to another wiseguy, I would say, "He's a friend of mine." That means he's an associate.
Q When an associate earns money through his criminal schemes what, if any, obligation does he have?
A He has to kick it up to whoever he's with.
Q Kicking up means what?
A Kickback.
Q An associate would kick money to whom?
A Whoever he's we with. It could be the wiseguy, it could be a captain, the boss, the underboss or boss. Whoever he's with, he makes a score, he's doing something illegal, he's got to kick back.
Q If someone gives an order in the Mafia, which way does that go? Down the chain or up?
A Down the chain.
Q If the boss gives an order, do they have to follow it?
A 100 percent.
Q Or else what?
A All depends what it is. If you ask him to murder, and you don't do it, you'll get murdered.
Q You've used the term "wiseguy." What does that mean?
A That means youre made, you youre not an associate.

Wiseguy, button man, goodfella.

Q So everyone on this chart above the level of associate is a made guy?

A That's correct.

Q And how do you become a made guy?

A Whoever youre around, they propose you. That list will come to me. Ill take that list and Ill show all my captains. What do you know about him? He's a good guy. He's a good guy. He's a good guy.

Then I will make a formal list and I'll send one list to each family of the other four families in New York. Now, it comes back, and there's no problem, then Ill make him. If there's an issue, well check to out.

Q When did you get made?

A 1977.

Q What day?

A June 14th.

Q Was that important to you at the time?

A At the time, I thought it was.

Q Describe for the jury how you got made.

A When I got made, there was five of us. There was the boss, there was the underboss, and there was another wiseguy there. They asked, "Do you know what youre doing here?" We were told to say no. "No." They said, "We're going to make you a wiseguy in the Bonanno Family." "You want to leave,

there's the door, you can leave now. You want to stay, well go on with the ceremony." There was five of us, we all agreed to stay and they told us the dos and don't.

Q What are the dos in the Mafia?

A Don't fool around with a wiseguy's girl, wife, kids. Never go to a meeting with a gun when youre meeting with wiseguys. Never raise your hands to a wiseguy. But if you do, there's consequences.

Q So those are the don'ts?

A Yes.

Q Are you permitted to cooperate with the law?

A And don't fool with drugs.

No, we never mentioned nothing about cooperating. But everybody knew its murder.

Q If you cooperate, you could got murdered?

A Hundred percent.

Q Where was the ceremony held?

A Maspeth, Queens.

Q In a public place?

A It was a bar.

Q And how was it conducted?

A There was people in the front, we was in the back, there was about ten of us. So when we were doing the ceremony, we had food there. We played a song on the jukebox, "Happy Birthday," to throw the people off in front of the bar to

think that it was a birthday party, not that it was a mob meeting. And we got made, five of us.

Q When it was your turn to get made, what did they do?

A They just made a speech. They said, "Normally, we put a gun and knife on the table. But the way times are, there's no gun and knife on the table. But imagine that it is." And we all agreed.

Q Did you make an allegiance to the Bonanno Family that day?

A Yes, I did.

Q What was it?

A We was told, all five of us, if your wife is dying or your mother is dying and we call you, you got to leave them and come. Your duty is here first. I agreed to that, we all agreed to that.

Q And once youre a made man in the crime family, how can you leave the Family?

A If they call you, you got to go.

Q How can you leave? Can you ever get out?

A Not really. Unless youre up in age. I let guys go to Florida but they need my permission. They're up in age and they said, I want to go to Florida, I said go ahead. But if I need him, I call, he's got to come in.

Q Are captains made guys?

A Yes, they are.

Q And how does a captain differ from a soldier?
A He's got a group of wiseguys. Could be three, could be five, could be ten, could be 15.
Q Are there captains without a crew at all?
A No, every captain has to have a crew. A minimum of three guys.
Q What is the role of a captain in an organized crime family?
A What's his position?
Q What's his role? What does he do?
A He services his men. He services his soldiers, his associates. And then he'll come and see me or the underboss and give me updates of what's going on.
Q What was the highest number of captains you ever had in the Bonanno Family when you were in the boss?
A I believe 16 without Canada. Canada and other ones, 17.
Q So those 16 men would be third highest rank in the Family?
A No, fourth.
Q Boss, the underboss, and the consiglieri?
A Then the captain would be fourth.
Q Are made men allowed to introduce themselves as made men?
A No.
Q So if I'm a made guy in the Gambinos and youre a made guy in the Bonannos how would we know that?

A If we both know we're made, we can't come over and say we meet somebody. Say somebody knows youre a friend of ours and he knows I'm a friend of ours. He'll come over and he'll say, Joe, meet Bob, he's a friend of ours with the Genovese; Joe is a friend of ours with the Bonanno Family, he's also official boss. Always is friend of ours first and then the title it he's a captain or underboss or whatever.
Q Youre familiar the with term "La Cosa Nostra"?
A Yes.
Q What's Italian?
A Yes.
Q What does it stand for?
A This thing of ours.
Q This thing of ours?
A Yes.
Q What's a friend of ours mean?
A Friend of mine. He means that he's a friend, he's a wiseguy.
Q Someone who has been inducted into a family?
A Correct. Associate isnt, a wiseguy is.
Q How did you come to know that Mr. Romanello is in the Genovese Family?
A I met him in my restaurant.
Q What restaurant was that?
A Casa Blanca.

Q Where was Casa Blanca located?
A Maspeth, Queens.
Q Approximately what years did you own and operate that restaurant?
A I opened that restaurant in 1996, November. I got arrested January of 2003. That restaurant existed until 2005.
Q And then what happened to it?
A The Government took it.
Q And were you formally introduced to Mr. Romanello?
A Yes, I was.
Q And what position were you told that he held in the Genovese Family?
A That he was acting captain.
Q Acting captain for?
A For "Tough Tony" in Corona.
Q And who was "Tough Tony" from Corona?
A He was a captain.
Q You used the term "acting". What does that mean in organized crime?
A That if the captain ain't there, the acting captain will act for him. The captain goes to jail, there's an acting captain. If youre on parole, you got an acting captain.
Q So back in the days when you had your lunch truck and your route and you were taking bets, did you end up going on record with a member of the Bonnano Crime Family?

A Yes, I was. Phil Rastelli.
Q You were his associate?
A Right.
Q And, as his associate, what obligation, what did you owe him? What did you have to do to him?
A Christmas time, I would throw him a couple thousand.
Q From all the illegal money you made?
A At that time, I was taking numbers and I had a little shylock business.
Q And were you under his protection? Did you have any protection by being on record with him?
A Yes if I had a problem, correct.
Q And, in the Mafia, what do you call a problem?
A You have a beef with another family. And you get into an argument with a guy who is around a wiseguy. They want to sit-down, I can't talk to the wiseguy. So for him to talk to me, he's got to be -- whoever is representing me to sit-down together.
Q So a beef is an argument?
A Yes.
Q In the Mafia, when guys have an argument, do they go into the police station and file a report?
A No.
Q Why not?
A Its not a good thing to do.

Q If youre in the Mafia, are you legitimate?
A As far as maybe legitimate businesses and illegitimate, both.
Q So if a person who is in the Mafia has a beef, how does it get resolved?
A It all depends on what the beef is. If its a legitimate beef, you got two ways you can go with it. You either you go to a lawyer or you go to the wiseguy youre with. If its illegal beef, you got to go to the wiseguy.
Q Under what circumstance would someone in organized crime go to a lawyer to settle a beef?
A If its a legitimate business, you know what I'm saying, I sold a business to somebody and he ain't living up to the obligation so what do you do? I'm going to take back the business but I got to go through the court.
Q And that happens quickly or not so quickly?
A It happens. It don't happen often but it does happen.
Q Now, if a person has a beef and he takes it to the wiseguy he's with, what does that mean?
A Well, he's going to give him a kickback. It all depends on what the beef is.
Q But its not legitimate?
A No.
Q For approximately how long were you an associate of the Bonanno Crime Family?

A '72 to '77 when I got made. Five years.
Q During that time, what types of crime did you commit on behalf of the Bonanno Crime Family?
A Whatever they told me to do.
Q What was the worst thing they told you to do?
A Murder.
Q Did you do it?
A Yes, I did.
Q Why?
A My boss asked me to.
Q Tell the jury what you did.
A My boss come to me for a favor for the Colombo Family. They wanted to kill this guy, they said he was an informant. So my boss said, we want you to do it. So I did it with a couple of other guys and come to my deli and we killed him in my deli.
Q What was your role in that murder?
A I got rid of the body. Threw it in a dumpster and I got rid of his car.
Q Were you ever arrested for that at the time?
A No.
Q When you began cooperating with the Government, did you tell the Government that you committed that murder?
A Yes, I did.
Q Did you plead guilty to that murder?

A Yes, I did.
Q Even though you never been a suspect in it?
A Correct.
Q Did you commit other murders on behalf of the Bonanno Crime Family as an associate?
A Yes. They come to me for Paul Castellano which is the boss of the Gambino family. They want to kill his future son-in-law.
Q The guy who was dating his daughter?
A Yes, correct.
Q For what?
A For making fun of him. And they went to my boss again and they said, we couldn't get him. So my friend had a cooking place in the city. He lured him there. Me, John Gotti, Frankie DiCicco, Sal Vitale, Angelo Ruggerio, Joe Watts. Killed him.

THE COURT: Its not clear. All of those people were there --

THE WITNESS: Yes, your Honor.

THE COURT: -- for the murder?

THE WITNESS: Yes, your Honor.

THE COURT: And who actually killed him?

THE WITNESS: John Gotti and Joe Watts. They were the shooters.

THE COURT: And he was killed at the behest of Paul

Castellano?

THE WITNESS: He wanted him dead. His name was Vito.

THE COURT: And Castellano came to whom to ask?

THE WITNESS: To my boss.

THE COURT: Rastelli?

THE WITNESS: No, he was acting then. "Nicky Glasses."

THE COURT: They were different families?

THE WITNESS: Different families. One was the Gambino Family and one was the Bonanno Family, your Honor.

THE COURT: Okay. And why did he want him killed?

THE WITNESS: He was making fun of him to his daughter. She wanted to get away from him. She told her father, the father wanted to kill him.

THE COURT: Okay.

THE WITNESS: And they couldn't get him.

THE COURT: I got it. Okay. Thank you.

THE WITNESS: Thank you, your Honor.

EXAMINATION BY
MR. DENNEHY:
(Continuing.)

Q Prior to cooperating and telling the Government all of the crimes you committed, were you charged with that murder?

A No.

Q Did you tell the Government you committed it?
A Yes, I did.
Q Did you plead guilty to it?
A Yes, I did.
Q We touched upon the term "acting." What does it mean to be an acting boss or an acting captain?
A When youre an acting boss, youre there in the boss's place. Acting captain is there in the captain's place.
Q What types of circumstances would lead to someone becoming a guy's acting captain?
A Well, he could be in jail; he could be on parole.
Q And if youre on parole in organized crime, what does that mean with respect to your freedom to commit crime?
A Well, youre on parole, so you don't want to get stupid and get violated so you put an acting captain in.
Q If someone is your acting captain, does that person act in your stead?
A Hundred percent. He speaks for me.
Q And, normally speaking, can a soldier sit-down with a soldier from another family --
A Correct.
Q -- to settle a dispute?
A Soldier on soldier, yes.
Q Can a soldier sit with a captain?
A No, he can't.

Q Why not?
A He's not his level. He has to sit with that guy's captain. Captain to captain.
Q So, for example, if I'm a soldier, and I want to have a sit-down with a captain from a different family, I have to bring my captain?
A Correct.
Q What if my captain is in jail or on parole?
A Then you'll sit down with the acting captain.
Q Have you ever served time in prison?
A Me?
Q Yes.
A Yes.
Q From when to when?
A I got convicted in 1987. I believe I went in January of '87, I came out November of '92.
Q For what crimes were you convicted at that time?
A Local 814, Teamsters.
Q What were you doing with the Teamsters?
A I was baby sitting the vice president, which was Phil Rastelli's brother-in-law, and he wind up being a cooperator.
Q When you say you were baby sitting, what were you doing?
A Well, I had to watch him because he was crazy.
Q Were the Bonannos putting money in their pocket off the Teamsters?

A Yes, they did.
Q You were convicted and went to jail for that?
A Yes, I did.
Q During the time that you were in the Bonanno Family, did you ever run from a charge or go on the lam?
A Yes, I did.
Q When was that?
A I was told I was going to be indicted for murder in 1982. I took off in March, I self-surrendered in July of '84.
Q After being told that you would be indicted for murder, were you actually indicted for murder?
A Yes, I was.
Q And where were you when the indictment came down?
A Pennsylvania.
Q And how long did you spend in Pennsylvania on the lam?
A Thirty months. From '84, I mean, from '82 to '84. March, April, May, June, July. 31 months, I mean 28 months.
Q And, at that time, what was your position in the Bonanno Crime Family?
A At that time, I was a captain.
Q So you had a crew of soldiers underneath you?
A Yes.
Q And beneath them were the associates?
A Yes.
Q And when they made money from crime, it got kicked up to

you?
A Sometimes.
Q And if you told them what to do, they had to follow your orders?
A Yes.
Q While you were on the lam with the murder indictment pending against you, did you get arrested?
A Yes, I did.
Q Tell the jury what you did?
A We went in a Grand Union about 2:00, 3:00 o'clock in the morning and we were looking for the cashier, she's not to be found. So I wanted to have a cigarette, so I grabbed a Marlboro. I lit up a cigarette. We were still waiting for her. The guy that was with me, he was robbed a pack of razor blades. We paid for whatever we had. When we were leaving, the cops were in the parking lot; they lock us up for shoplifting.

I go to court about 3:00, 4:00 o'clock in the morning. I go see the judge and she gives us a $600 fine, she lets us go.

But before I went to court, I was in the county jail and they took or prints. At that point, they had no place to check who I was. It happened in Milford, Pennsylvania, they had to send them to Harrisburg.

So I was staying at a resort, and I was friendly

with the owner, which I knew him from 20 years ago and I told him the story. I said, once my prints come back, they're going to see I'm a fugitive, I got to get out of here. He said, wait a minute. I got a friend in Lords Valley, he's a state trooper. Them prints got to go there and then to Harrisburg let's see what we can do. The guy got my fingerprints and he ripped them up, so I stood there.

Q So when you got arrested for shoplifting, you didnt tell the cop your name was Joseph Massino, fugitive for murder?

A I told him Joe Russo.

Q But you knew that if your fingerprints ever got to the FBI they'd find you for the murder?

A Hundred percent. I was going to take off.

Q So you bribed the state trooper to get rid of the prints?

A No, he did it as a favor for the guy in the restaurant, Tony. I think I bought him dinner.

Q Did there come a time when you actually surrendered to the Southern District of New York federal court and went to trial on those murder charges?

A Yes, I did.

Q What happened?

A I surrendered July 9th, I believe, 1984.

Q And did there come a time when you actually went to trial on those murder charges?

A I went to trial, 1987. I believe, April.

Q What happened with the trial?
A I got acquitted on every count.
Q Were you guilty of all of those counts?
A Yes, I was.
Q Nevertheless, you got convicted of the Teamsters case; correct?
A Correct. I was doing time. I was incarcerated when I went to trial for the murder case.
Q So they brought you from your jail time sentence to sit trial for murder and you got acquitted?
A Correct.
Q While you were in federal prison serving the sentence on the Teamsters case, did you ever bribe prison officers?
A Yes.
Q Tell the jury what you paid them to do.
A Somebody had a cop, we took care of the cop. He brought us in shrimp, linguine and clams, pastry. Every couple of days. There was about ten of us eating.
Q When you said "the cop," you mean the prison guard?
A The correction officer in prison.
Q Did you ever get caught?
A No.
Q Were you ever prosecuted for that?
A No.
Q When you began to proffer with the Government, tell them

the crimes you committed, did you tell them about that?
A Yes, I did.
Q When you were boss of the Bonanno Crime Family, did you agree to have certain individuals straightened out or become made members of the Family?
A It had to go through me. I had the final say, yes.
Q And what would be a knock against someone not becoming a member of the Family?
A It all depends what he did prior. If a guy was -- they try to put a guy in that's a cop two or three times. I said, no, we make cops, what are we going to make lawyers next?
Q Did the person have to be of Italian heritage to become made?
A Yes and no. Some families -- I enforced it you had to be Italian a hundred percent. But when I took it over, as long as your father was Italian they didnt care what your mother was.
THE COURT: I'm sorry. What was your rule when you took over, mother and father had to be Italian?
THE WITNESS: I put that into effect, your Honor. Mother and father had to be Italian.
EXAMINATION BY
MR. DENNEHY:
(Continuing.)
Q As the boss of the Family, did you ever meet with the

bosses of the other families?
A Yes. I sat on the Commission.
Q What was that?
A Five families in New York, and its called "the Commission."
Q Who were the bosses of the five families at that time?
A Back then? It was Phil Rastelli; I was acting in the capacity of boss; Paul Castellano; Junior Persico; Tony Ducks and Chin.
THE COURT: And who else?
THE WITNESS: Chin. Vincent Gigante.
THE COURT: Vicinity Gigante?
THE WITNESS: Yes.
EXAMINATION BY
MR. DENNEHY:
(Continuing.)
Q Vincent Gigante was boss of the Genovese Family?
A Yes, he was.
Q And he was known as "the Chin"?
A Yes.
Q Do you know why?
A That was his name, "the Chin" or "the Robe."
Q Why did they call him "The Robe"?
A Because he would walk around the Village in a robe.
Q Did the Genovese Family have another family?

A "The West Side."
Q Do you know why they were called "The West Side"?
A Because that's where the Chin came from. The West Side, the Village.
Q When you were engaged in criminal activities as a member of organized crime, would you take steps to avoid law enforcement?
A All the time.
Q Tell the jury what you did.
A I had their frequencies. We had an FBI agent on the payroll. I had all their frequencies and I used to monitor them.
When I went to sleep, I had a tape recorder, voice activated. And I would hook to up and when I got up in the morning I would listen to it.
Q Did you ever talk on the telephone?
A Never.
Q Why not?
A Didnt trust the phones.
Q What can't you trust about the phone?
A The phones would be tapped.
Q And if you get caught talking on the telephone, what happened happen?
A It all depends who you got involved with. You could get killed, you know youre going to get indicted.

Q Did you ever have conversations about criminal activity in your own home?
A Nobody came to my house.
Q Why not?
A I didn't believe in that. I don't want nobody in my house.
Q What were you concerned about?
A Law enforcement, wire in my house.
Q Were you aware of the FBI when you were out and about committing crimes?
A Yes, I was.
Q How so?
A We had a detective on the payroll and we had a agent give us tips. I had all their frequencies, so I was listening to their conversations.
Q But, in general, if you were walking the streets were you on the lookout for the FBI?
A All the time. I come out of my house looking up in the air because they would follow me with helicopters.
Q If you wanted to have a conversation with a member of organized crime about crime activity, what would you do?
A I would go for a walk.
Q What's that called in the mob?
A Walk-talk.
Q Why do you go walking and talking?

A Its hard. I don't know anybody that walk-talked and got pinched.
Q Why is that?
A Its very hard. If youre standing still talking, yes.
Q Why didnt you discuss criminal activity indoors?
A Because I didn't trust it.
Q Explain that. Trust what?
A I never trusted. I was always leery of surveillance. I drove myself. Didnt talk on the phone. Didnt have no cellphone. Didnt talk in my club. If I had to talk anything serious, I would go on the boardwalk and I would face the ocean, look at the water.
Q Why did you do that?
A Because you can't pick up the conversation from the water. If we were just talking about things in general, I would walk down a one-way where the cars got to come this way. And if a car is coming that way, its for a reason and I didn't make a mistake. We would just stop our conversation and we would end our meeting.
Q You mentioned that there was once attempts to put a cop in the Bonanno Crime Family?
A It was an FBI agent.
Q What was his name?
A Joe Pistone.
Q What name did he use?

A Donnie Brasco.
Q What happened in that case?
A "Sonny Black" said he knows him for 20 years and he wanted to put him in. But being all the troubles that we had in our family, from '78 to '84 nobody got made. And he wanted to put Donnie Brasco in and Paul says, Castellano, which was the boss of the Gambino Family said you can't make nobody until Phil Rastelli comes home.
Q And he was an actual FBI agent posing as a --
A He was an FBI agent, yes, on the Bonanno Squad.
THE COURT: I don't think this -- this might be obvious but its not plain. I take it.
THE WITNESS: Excuse me, your Honor.
THE COURT: I said this might be obvious, but I don't think it was plain from the testimony.
At the point in time that he was being considered, none of you knew he was a FBI agent?
THE WITNESS: Correct. None at all. "Sonny Black" said he was his good friend which he didnt know.
EXAMINATION BY
MR. DENNEHY:
(Continuing.)
Q After that, were there more restrictions on who could propose somebody and who would vouch for a guy to get made in the Family?

A I put in to effect you have to be in this family for eight years. You got to be around a wiseguy for eight years and that's to protect the Family because I didn't believe the FBI would spend eight years to try to infiltrate the Bonanno Family and that was the reason for that.
Q In the Mafia, what is beef?
A A beef is an argument with another guy from another family.
Q You mentioned that made men can't put hands on each other?
A You could die for that. There's penalties for that, you can't raise your hands.
Q What's the basis of that rule?
A Its being disrespectful hitting another wiseguy. The same way you can't walk around with a gun to go visit a wiseguy. You got bad intentions.
Q If one wiseguy punches out another wiseguy, there could be repercussions?
A Correct.
Q So how do the wiseguys know who each other are? There's no scorecard; right?
A If you don't know, its one thing. But if I know youre wiseguy, and you know I'm a wiseguy, and you get cocky with me and I punch you in your face, that's different.
But if I don't know that youre a wiseguy, I didn't

know that he was a wiseguy. They'd have to prove that you met him as a wiseguy.

Q And so, is one of the reasons to avoid confusion that made members introduce one another to each other from different families?

A That's correct.

Q So the Mets know whose on the Yankees, so to speak?

A Correct.

Q And if two associates of organized crime have an argument, and they decide not to go to court and the lawyers, where can they take that?

A Whoever they're around. If its a wiseguy or captain or whoever.

Q And, for example, if a Bonanno associate has a disagreement with a Genovese associate, where would that lead in your experience?

A It all depends. If youre with a goodfella, a wiseguy, then you go to go see the wiseguy, whoever he's around in the Genovese Family. If youre with a captain in the Bonanno Family, then you got to go see a captain in the Genovese Family. A wiseguy cannot sit down with a captain.

Q A soldier and a captain cannot resolve a dispute?

A No.

Q One of them has to bring his captain?

A A hundred percent.

Q What are those meetings called?
A Sit-downs.
Q Where can sit-downs be held?
A A lot of times in diners, in restaurants, parks.
Q Would you ever bring your phone to a sit-down?
A No.
Q Why not?
A Any time I had a sit-down, or any time I had a captain's meeting, they knew nobody could bring a phone.
Q And why was that?
A I didn't trust them. Wired.
Q What would happen if you attended a sit-down and the phone was wired?
A I take it that I'm a cooperator and I got bad intentions because youre told not to bring a phone. Why would you bring a phone?
Q If you conducted a sit-down and that somehow got recorded, what would be your concern will the sit-down being recorded?
A You're going to get pinched. You're conducting a ceremony, they'll have the ceremony on tape of making guys.
Q Why would you get pinched for doing a sit-down?
A If youre making guys?
Q No. Why would you get pinched for doing a sit-down?
A Well, if you're talking about crimes. Shylocking, that's

a crime. Bookmaking, that's a crime. Extortion, that's a crime.
Q If it ended up on tape?
A Youre going to get pinched.
Q By that --
A Its out of your own mouth.
Q So, when you were running your family and conducting sit-downs, no one could bring a phone?
A No.
Q Did you conduct sit-downs in public places where strangers might be sitting next to you?
A Sometimes.
Q Well, what steps did you take to make sure there wasn't an undercover FBI agent there?
A It all depends on what you were sitting down for. If it was a stupid beef, he didnt mind. If it was a serious beef, we would go for a walk or meet in the park.
Q If, for example, a Bonanno soldier was going around trying to collect money and he was using the name of a different family saying the money was for someone else, would there be consequences for that?
MR. McMAHON: Objection.
THE COURT: Sustained.
MR. McMAHON: Judge, can I also ask to have the chart put down.

MR. DENNEHY: (Complying).

EXAMINATION BY

MR. DENNEHY:

(Continuing.)

Q When you were boss of the Bonanno Family, did you have people go out to collect your money or protect your interests?

A Correct.

Q Were they authorized to use your name? I'm here for Joe Massino, I want his money.

A They knew if I sent a captain to collect something, they knew he was there from the Family.

Q People knew who your captains were?

A Correct. Other wiseguys.

Q If some guy from the Colombos was running around using your name to collect money for himself, would there be a consequence for that?

MR. McMAHON: Objection.

THE COURT: Can I see you at the side bar for a moment.

(side bar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

(Continued on the next page.)

(In open court.)

EXAMINATION BY

MR. DENNEHY:

(Continuing.)

Q Did it ever come to your attention, sir, that someone was using your name for his own benefit?

MR. McMAHON: Objection.

A Yes.

THE COURT: Yes. Ill sustain the objection. I think we just discussed this.

MR. DENNEHY: All right. If I may, I'm going to show some photographs which are without objection.

THE COURT: Do they have exhibit numbers on them, and have they been previously introduced?

MR. DENNEHY: Some have and some are going to be introduced now, your Honor.

THE COURT: There's no objection to them being introduced.

MR. McMAHON: I don't believe so, Judge.

THE COURT: What are the new exhibit numbers?

MR. DENNEHY: Government 3 is in evidence, your Honor.

Q Do you recognize that individual, sir?

A Yes, I do.

Q What's his name?

A "Junior Chilli".
Q Do you know his first name?
A Joseph.
Q Was he affiliated with the Bonanno Crime Family?
A He was a captain in the Bonanno Family.
Q Showing you Government's Exhibit 7 in evidence, your Honor.
Do you recognize that individual?
A Yes, I do.
Q What's his name?
A I know him as "Red."
Q What was his affiliation with the Bonanno Family?
A He was just friends. I believe he was around the Genovese Family.
Q This is for identification, Government Exhibit 8.
Do you recognize him?
A That's "Tough Tony". He's a captain in the Genovese Family.
Q Do you know his true name?
A Federici, something like that.
Q How did you first come to meet him?
A I met Tony in the '70s.
Q Were you introduced to him as a made member of the Genovese Family?
A Correct. Maybe the late part of the '70s because I got

straightened out in '77 and he was straightened out in '76.

THE COURT: Straightened out is another term for what?

THE WITNESS: That means being made a wiseguy.

EXAMINATION BY
MR. DENNEHY:
(Continuing.)

Q So if you say a guy got straightened, or he's straightened out, or I'm going to straighten him out, that means you're going to induct him into the Family?

A Correct, he's proposed.

Q When you met "Tough Tony," was he not only a member of the Genovese Family, but did he have a higher position?

A I think back then when I met him in the late '70s I think he was just a wiseguy.

Q Did you ever know him to hold a higher position?

A Yes, captain.

Q Did he have any businesses that you knew of?

MR. McMAHON: Objection.

Q Legal businesses?

A Legal, yes.

Q What was that?

A He's got a restaurant in Corona called Parkside.

Q Where is that located?

A 108th Street in Corona.

Q Is it near a park?
A Right across the street from Spaghetti Park.
MR. DENNEHY: This is Government 9 in evidence.
THE COURT: Was eight in evidence.
MR. DENNEHY: I offer eight, I'm sorry.
MR. McMAHON: No objection.
THE COURT: Eight is received.
(Government's Exhibit 8 was received in evidence as of this date.)
EXAMINATION BY
MR. DENNEHY:
(Continuing.)
Q Nine is in evidence. Who is that?
A That's "Fat Anthony" Rabito.
Q What's his affiliation with organized crime?
A He's a captain in the Bonanno Family.
Q Who made him?
A I proposed him. Carmine Galante made him.
Q Government's 10, which is in evidence.
Who is that?
A Romanello.
Q What's his first name?
A I believe its Anthony.
Q Did you know him by any nickname?
A "Rom."

Q And you said you were introduced to him at your restaurant?
A Correct.
Q When you were running Casa Blanca restaurant, what type of clientele did you have?
A All kinds. Wiseguys, lawyers, we had a judge, supreme court.
Q And how often did you see Mr. Romanello in your restaurant back in those times?
A I would see him. I didn't go all the time, but if I went there on the weekends I would see him there.
Q Were you ever formally introduced to him?
A Yes, I was.
Q And what was his rank as you understood it to be?
A He was an acting captain for "Tough Tony".
Q And by saying, he was the acting captain for "Tough Tony," what did you understand that to mean?
A That he would he run the show for "Tough Tony".
Q This is Government 11 for identification.
Who is that?
A That's Nicky Santora, also known as "Nicky Mouth."
Q Why did they call him "Nicky Mouth"?
A Because he talks a lot.
Q What was his position in organized crime?
A When I left, he was a wiseguy. I made him, I

straightened him out.
Q What was the highest position he ever attained?
A I believe he was the underboss.
Q Was there ever a time when he was a capo, a captain?
A Yes, there was.
Q Are you familiar with the name Vito Badamo, B-a-d-a-m-o?
A Yes, I am.
Q How many Vito Badamo's did you know?
A Two.
Q Father and son?
A Father and son.
Q What did you know about the father?
A I met the father when the father was a wiseguy in the Bonanno Family.
Q An actual inducted member?
A Yes, he was.
Q What, if anything, did you know about him?
A I didn't know much about him. I know that him and the son, and I believe the son-in-law they tried to rob some drug dealers.
Q Where?
A I believe it was upstate or the Bronx. And the wind up was they were DEA agents and they had a shootout. They killed the son-in-law. I believe he got shot, he walks with a limp, and the son was there. They went to jail.

Q What, if anything, did you know about the son, Vito Badamo, and his relation to the Bonannos?
A They straightened him out, he's a wiseguy.
Q When was he straighten him out?
A I would say 2004.
Q Where were you at the time?
A I was incarcerated.
Q How did you come to learn that they straightened out or made Vito Badamo a made member?
A "Vinny Gorgeous" sent word to me.
Q Who he was at the time?
A He was the boss.
Q When you were the boss of the Family, was it important for you to know who the made guys were in family?
A Hundred percent.
Q Why?
A Because they couldn't get made without me giving my blessings. I didn't give my blessings to these guys.
Q And even once they got made, why was it important for you to know who was in the family and who was not?
A Well, he wanted me to know because he knew I was going to find out. I'm in MDC, there must have been 20, 30 wiseguys. You ain't going to keep that a secret who got made.
Q And the MDC is the Metropolitan Detention Center?
A Yes, it is.

Q Federal jail?
A Yes.
THE COURT: Let me just clarify.
These were people who were made in your absence when you were in prison?
THE WITNESS: Yes, your Honor.
What happened is they had to do, if they knew the guy for eight years, and if you came out of prison, you had to wait five years especially when you went away for drugs, to make sure that you didnt go back to your same routine. This kid came out and they made him.
THE COURT: All right. But this was your family?
THE WITNESS: Correct.
THE COURT: And you didnt -- you were in prison, you didnt approve it. You were just told?
THE WITNESS: I didn't know nothing about it. I was told after the fact, your Honor.
THE COURT: So it could happen without your approval then?
THE WITNESS: It's not supposed to.
THE COURT: Its not supposed to?
THE WITNESS: No.
THE COURT: Okay.
EXAMINATION BY
MR. DENNEHY:

(Continuing.)
Q When that occurred, Vinny Gorgeous, Vincent Basciano, was the acting boss of your family?
A Correct.
MR. DENNEHY: Your Honor, to the extent I neglected, I offer Government's 11, Nicholas Santora, in evidence.
THE COURT: Received.
(Government's Exhibit 11 was received in evidence as of this date.)
Q You mentioned that if someone has a dispute or financial or otherwise they could either go to the courts or they could go to a wiseguy?
A Correct.
Q They go to a wiseguy, what is the result of that in your experience?
A It all depends. It could be done as a favor or it could be done has my hands are in your pocket. Now you owe me, I'm going to shake you to down.
Q How would that work, the latter scenario?
A It all depends on what the guy is doing.
Q Suppose there is a debt that is owed between two associates and they go to their soldiers or their captains and say, we want to resolve this debt.
MR. McMAHON: Objection.
A For the most part --

THE COURT: Ill sustain the objection.

EXAMINATION BY
MR. DENNEHY:
(Continuing.)

Q Are there circumstances in organized crime where if two captains meet and resolve a dispute, that the resolution is binding on the people involved?

A Pretty much so.

Q How is it binding on them?

A If I give you my word that if he doesn't pay, Ill pay you. For the most part, they'll live to that. Then whatever he does with the wiseguy or the associate that's his business as long as I get my money.

Q You being the captain?

A Being the captain.

Q When you began cooperating with the Government in 2004, did you attend what are called "proffer sessions"?

A Yes.

Q What are those?

A Where you sit down with the prosecutor and the agents. Then you debrief of what you know and what I did in the life of crime.

Q Is that what occurred after your case, after you began to cooperate in 2004?

A Correct.

Q Did you tell them about everything?
A Yes, I did.
Q Was there any concern on your part that you couldnt leave anything out about your criminal history?
A No. I believe you can't be half pregnant. You are or you ain't.
Q Did there come a time when you pled guilty to additional charges, the one ones the told the Government about when you gave those proffer interviews?
A Yes.

(Continued on the next page.)

BY MR. DENNEHY:
Q And when you pled guilty to those additional charges, did you do so pursuant to a written agreement with the government?
A Yes.
MR. DENNEHY: May I approach the witness?
THE COURT: Yes.
Q Do you recognize that document on the last page?
A Yes.
Q And what is that document?
A It's my signature.
Q Is that your cooperation agreement with the government?
A Yes, it is.
MR. DENNEHY: Any objection?
THE COURT: Is there an objection?
MR. McMAHON: No objection, your Honor.
MR. DENNEHY: All right, I would offer that.
THE COURT: It's acceptable to the defense that it go in at this point in time?
MR. McMAHON: Yes, Judge.
MR. DENNEHY: I offer that.
THE COURT: What exhibit is that?
MR. DENNEHY: 3500JM-1.
THE COURT: All righting, it will be received.
(Government's Exhibit 3500JM-1 received in evidence.)

Q At the time you signed this agreement, Mr. Massino, did you agree to cooperate fully with the United States government?
A Yes, I did.
Q The trial that you had, had where the jury found you guilty of seven murders, did you agree that that verdict was, in fact, correct?
A Yes, it was.
Q And the jury's verdict to have you pay over $10 million in fines and penalties for your life of crime, did you agree to that as well?
A Yes, I did.
Q Did you plead guilty to additional murders that you had told the government about, the ones you had never been suspected of?
A Yes, I did.
MR. McMAHON: Objection.
Q Never been charged with?
MR. McMAHON: There's a big difference.
THE COURT: Excuse me?
MR. McMAHON: I'm sorry.
THE COURT: I'll sustain the objection to the first question. Ask the jury to disregard the statement: Suspected. Your second question: Hasn't been charged with. So I'll let the answer to the second question stand.

Q Did you plead guilty to racketeering?
A Yes, I did.
Q In connection with which organized crime family?
A The Bonnano family.
Q Did you agree to forfeit properties that the government said you obtained through crime?
A Yes, I did.
Q Including your Casa Blanca Restaurant?
A Correct.
Q Other properties that the jury found were paid for by what, criminal proceeds?
A I gave them five pieces of property.
Q Pursuant to the trial where the jury convicted you and then your plea, were you actually sentenced for your crimes?
A Yes.
Q What sentence did you receive?
A I got a life sentence for the seven murders, then I got another life sentence that I pleaded guilty to. So I got double life sentence running consecutive.
Q You have to serve life twice?
A Correct.
Q What understanding do you have about your obligations under your agreement with the government? What do you have to do under the terms of the agreement?
A Tell the truth, don't lie.

Q Tell the truth about what?
A Everything that I did, as far as crime.
Q Does that include everyone that you know?
A Yes.
Q What is your understanding of what could happen if you get caught telling a lie?
A They rip up my plea agreement.
Q You get to take your plea back?
A No.
Q Do you get to challenge the jury's verdict?
A No.
Q What sentence do you serve?
A Life.
Q How many times?
A Twice.
Q What is your understanding of the government's obligations under the terms of your agreement if you fulfill it?
A I'm hoping that some day I see light at the end of the tunnel.
Q How would that happen?
A It's up to the judge; give me a Rule 35.
Q What is your understanding of what a Rule 35 motion is?
A Reduction of sentence.
Q Have you ever been promised a reduction of sentence?

A No.
Q Do you know if the judge will reduce your sentence?
A Not at all.
Q Do you know if the government will even file a Rule 35 motion?
A I'm hoping so.
Q What can you do to see that the government write such a motion?
A Tell the truth; whenever they need me, I'm here.
Q Does the judge have to accept the motion?
A I don't think so.
Q Does the judge have to reduce your sentence?
A No, he doesn't.
Q Could you still get a life sentence pursuant to --
A Yes.
Q -- the terms of this agreement?
A Yes.

MR. DENNEHY: May I have one moment, your Honor. I have no further questions for this witness, your Honor.

THE COURT: Counsel.

MR. McMAHON: Yes, Judge.

CROSS-EXAMINATION
BY MR. McMAHON:

Q Mr. Massino, you went to trial on a case in which you were charged with seven murders. Is that correct, sir?

A That's correct, sir.
Q And, in fact, that was in this building?
A Yes.
Q And you were convicted. Is that right?
A That's correct.
Q And you were sentenced by a judge to life in prison. Is that correct?
A That's correct.
Q So notwithstanding any plea agreements, you earned a life sentence by committing seven murders going to trial and losing trial. Is that correct?
A That's correct.
Q And the verdict was what day?
A I believe the verdict came in July 30, 2004.
Q And at the time that the verdict came in, the jury found you guilty of seven murders, did you have another pending case?
A Yes, I did.
Q And that case was the murder of George from Canada?
A That's correct.
Q And were you facing the death penalty, lethal injunction on that case?
A Yes, I was.
Q And, in fact, the attorney general of the United States had authorized these prosecutors to seek the death penalty

against you. Is that correct, sir?
A That's correct.
Q And you did not want to die by lethal injection, did you, sir?
A I wasn't worried about that case, Counsel.
Q So did you want to die by lethal injection or did you not?
A I didn't think about it.
Q You didn't think about it?
A No.
Q You're telling this jury, under oath, that you didn't think about whether or not you were going to die by lethal injection?
A Correct. You want me to explain it to you?
Q No. You can explain speeches later on, when Mr. Dennehy gets back up.
MR. DENNEHY: Objection.
Q How long did it take you, after the jury verdict of guilty on the seven murders, to decide that you wanted to cooperate with the people over here?
A The same day.
Q Okay. So it took you all of what, 30 seconds?
A Maybe.
Q And, in fact, you had been planning if the trial goes south, Joe Massino, has an alternative plan. Is that right?

A That's not correct.
Q So it took you seconds but you hadn't preplanned the idea of cooperating if your trial goes badly?
A That's correct.
Q Now, you had -- when Mr. Dennehy asked you some questions about crimes that you committed, and you told the government about it while you were cooperating. You remember those questions?
A Correct.
Q And I think he had suggested that the government didn't know about those crimes, so that you were sort of giving them information they didn't know about?
A Correct.
Q Well, would you tell the jury who Sal Vitale is?
A He's my brother-in-law.
Q He's your wife's brother?
A Correct.
Q And what was his position in the family when you were boss?
A I made him my underboss.
Q Okay. So he's the number two guy in the family. If we're looking at this chart here. He's the underboss. This is your wife's brother?
A Correct.
Q Now, he's done a number of murders with you?

A Some.

Q Okay. So -- and you knew, sir, that he was a cooperator before you were?

A Correct.

Q So that he certainly would have told the government everything about Joe Massino. Right?

A No. He didn't know everything about Joe Massino.

MR. DENNEHY: Objection.

Q So you hid some things from him?

A It was none of his business. He wasn't around me at that time.

Q I see. He's your wife's brother?

A Correct.

Q And he's an underboss?

A Correct.

Q Did he know you did murders?

A Correct.

Q Okay. So you could assume he probably told the government about your murders?

A Correct. But there was murders that he didn't know about.

Q Oh, I see. So you hid a couple of murders from Sal?

A It's none of his business.

Q Right. He's our brother-in-law. He's your wife's brother.

A It doesn't make a difference.
Q How long have you been married to your wife?
A Fifty-four years.
Q All right. You made a speech about still being with your wife. Is that correct, sir?
A Correct.
Q And how many girlfriends have you had in those 54 years?
A One.
Q Now, when did you learn that your brother-in-law, your wife's brother, was a cooperator for the government?
A Same day I got pinched.
Q That was January of 2003?
A That's correct.
Q And did your brother-in-law, in fact, provide information that led to your indictment?
A I was already indicted.
Q He was arrested the same day, wasn't he?
A Correct.
Q So he -- he was -- Both of you were arrested on January 9, 2003, and he flipped the same day?
A Correct.
Q And you waited until you blew trial to flip?
A Correct.
Q Did he testify against you at trial?
A Yes, he did.

Q So I assume that Sal Vitale is not the only cooperator in the Bonnano family?
A That's correct.
Q In fact, there are six of them?
A Maybe more than that.
Q Maybe now more than that. But at the time you decided to cooperate, you knew that there were six cooperators. Is that correct?
A No, there were nine cooperators.
Q Nine. Okay. It's like, I thought you did nine murders, but it turns out you did 12?
A I'm giving you an honest answer.
Q I understand that. I appreciate it.
So Sal Vitale was not the only source of information for the government, in terms of what you have to disclose to them. Is that correct?
A Correct.
Q So that you didn't -- you didn't decide to become a cooperator, sir, because you found religion, did you?
A No.
Q Now, your brother-in-law, he was involved in what, 11 murders?
A He had other murders that I wasn't involved in.
Q But do you have any recollection as to how many murders he did?

A I think more than 11.
Q More than 11. And he recently got a sentence of time served?
MR. DENNEHY: Objection, Judge, not relevant.
A I really --
THE COURT: I'll sustain the objection.
A I don't know that, Counsel.
Q You don't know that?
THE COURT: If I sustain -- excuse me. If I sustain the objection you don't have to answer the question.
THE WITNESS: I'm sorry.
Q Well, you are in federal prison. Is that correct, sir?
A That's correct.
Q And a lot of inmates come in and out of prison?
A Correct.
Q And don't you sort of keep up on what's going on in your family, the Bonnano family?
A I really don't care what's going on in the Bonnano family.
Q Now, are you hoping to get time served, sir?
A I got no idea what they're going to recommend.
Q But I didn't ask you that.
A I don't know. I got no idea.
Q I didn't ask you that question. I'm asking you, what you, Joe Massino, sitting in that chair now, are hoping for?

A I'm hoping to see daylight at the end of the tunnel.
Q And if you got time served, you wouldn't mind that?
A Not at all.
Q Now, can you tell the jury the names of the 12 people that you had a hand in murdering?
A Yes.
Q All right, tell them.
A You want their names?
Q Yeah.
A Sonny "Red", Philly "Lucky", Trinny, Sonny "Black", Cesar, Tony Mirra.
Q That's five or six. You're about six short.
A I want to do the first indictment. There's one more. Sonny "Red," Philly "Lucky," Trinny, Sonny "Black," Cesar, Gabe, Tony Mirra. That's the seven murders. Then the other murder with the other case was George from Canada, Sasha is his last name.
And then we had the murders that I gave the government; the guy by the name of Tommy Numo, Vito Barelli, and Joe Pastory.
Q Joe Joe?
A Joe Joe, Doodle also is his name.
Q Is there another one out there?
A Bobby Capozzio, I believe.
Q So that's 12 murders; 12 human beings that you had a hand

in killing?
A That's correct.
Q Now, was there a weapon of choice that you would direct to be used or whatever was handy?
A I believe all 12 murders were done with guns.
Q Was that something that was a Joe Massino rule?
A No, it wasn't my rule.
Q Now, of the 12, were you the shooter on any of the 12?
A No.
Q Was there some reason why you weren't the shooter on any of the 12?
A I wasn't told to be the shooter.
Q Some of these were while you were boss?
A Correct.
Q So nobody was telling you to do it?
A No one. I decided and I would give it to somebody.
Q And how about when you were disposing of bodies. Did you ever cut up bodies?
A Did I ever cut up bodies, no.
Q Did anybody ever cut up bodies on your behalf?
A Not on my behalf. They did cut them up. I wasn't the boss then.
Q Now, you said that you, you were just briefly describing for the jury about these proffer sections.
A Correct.

Q Is a proffer session where you go in and you tell the government certain things that you know, and then they decide whether they want to sign you up as a cooperator. Is that basically the thrust of what proffer sessions are?
A I believe so.
Q So that you're sort of auditioning. You're telling them this is the information I have, can I get an agreement?
A Correct.
Q How many times did you have to do a proffer session before you got an agreement?
A I couldn't answer. Maybe 20 times.
Q So 20 different times you had to audition before they finally said, okay, we'll sign you up for a cooperation agreement?
MR. DENNEHY: Objection.
THE COURT: I'll sustain the objection to the form.
Q Now, at some of the time -- over what period of time did these proffer sessions take?
A 2004 and 2005.
Q So it's a number of months -- six, seven, eight months?
A Fair to say; maybe a little longer.
Q And they would call you, you would get brought out of MDC, which no one knew you were undergoing these proffer sessions. Is that correct?
A Correct.

Q Nobody on the -- I mean, the government side knew but nobody on the defense side or nobody on the Bonnano family knew. Is that correct?
A Correct.
Q Nobody in the MDC knew?
A Correct.
Q Now, you were at MDC the whole time?
A I cooperated July; August, September -- they took me down day after Thanksgiving and they put me in the hole.
Q At MDC?
A MDC Brooklyn.
Q Did you stay at MDC until you signed the cooperation agreement and pled guilty on the murder for George from Canada next -- 2005?
A Yes.
Q Now, as far as you still had an attorney on that open case, the murder of George from Canada. Is that correct?
A Correct.
Q And your attorney didn't even know that you were having these proffer sessions. Is that correct?
A That's correct.
Q So the government arranged for you to get a secret lawyer?
A Correct.
Q And that secret lawyer just happened to be the former

Case 1:03-cr-00929-NGG Document 1177-7 Filed 06/10/13 Page 70 of 119 PageID #: 13386


head of the Strike Force in the United States Attorney's office --

THE COURT: Can I see you at side bar, please.

(Side bar begins.)

(Continued on the next page.)

(Whereupon, the following discussion takes place at the side bar, out of the hearing and presence of the defendant and jury.)

MR. DENNEHY: My point is outside of the jury's presence we can ask the witness if he knows.

THE COURT: You can ask that question. You can ask -- Mr. Massino, you were at some point appointed counsel when you decided to testify. You were appointed Mr. McDonald?

THE WITNESS: Ed McDonald, yes, Your Honor.

THE COURT: Do you know how it was that you came to be represented by Mr. McDonald?

THE WITNESS: The Court gave him to me.

THE COURT: Did any prosecutor at that time tell you they were going to try and get Mr. McDonald to represent you?

THE WITNESS: Not at all. When I went into the judge's chambers, the judge gave him to me.

THE COURT: Okay.

MR. DENNEHY: I'll confirm that independently.

THE COURT: All right.

(Jury present.)

THE COURT: All right, ladies and gentlemen, please be seated.

MR. McMAHON: May I inquire?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. McMAHON:

Q Now, Mr. Massino, you said that -- I think you said you got made in 1977, was it?

A That's correct.

Q And one of the things that you were asked at the ceremony, when you were inducted into the Bonnano family, was do you know why you're here. Is that correct?

A That's correct.

Q The boss asked you that?

A Correct.

Q And you were told that you had to lie to that question?

A That's correct.

Q So you had to tell the boss you didn't know why you were there?
A That's what I was told and that's what I said.
Q So from the very first moment, your induction into the Bonnano family is sort of based on a lie. Is that correct?
A That's correct.
Q And there wasn't -- there wasn't even a gun and a knife there?
A No.
Q And those were tools that are -- or things that are supposed to be done?
A Correct.
Q Now, you testified on direct examination that you lied in court to get a charge thrown out. Where was that? A state or a federal charge?
A Brooklyn.
Q Brooklyn state court or federal?
A Feds.
Q Huh?
A Federal.
Q So this courthouse?
A Yes.
Q So basically you were sitting in a chair similar to what you're sitting in today?
A Correct.

Q You swore to tell the truth?
A Correct.
Q And you lied?
A Yes, I did.
Q And you did it so convincingly you had the case dismissed?
A Correct.
Q Now, one of the -- I think you said -- you mentioned one of the rules, to the extent there are any, was that you can't have a cop or something become a member of an organized crime family?
A A made member, correct.
Q A made member. They could be associates. Is that correct?
A Well, to be made you got to be an associate.
Q Okay. But I mean you -- somebody that's a cop can't rise above the level of associate?
A Correct.
Q Now, does that apply to all types of law enforcement, including, let's say, correction officers?
A Same thing.
Q But your brother-in-law was a correction's officer, wasn't he?
A Never knew that. I was --
Q You were -- when you and your wife got married, both of

you were age 17. Is that right?
A I was 17, she was 16.
Q And Sal was her brother?
A Correct.
Q And so you were married all through the time of your 20s, her 20s, 30s, 40s, and 50s. Is that correct?
A Correct.
Q And you didn't know that her brother was a correction officer?
A That's correct.
Q Or did you simply choose to disregard it because it suited your purposes?
A No, I didn't disregard it. I was told that he was a counselor for a drug program.
Q And you later found out he was a correction officer?
A I didn't know that until he took the stand against me; that's correct.
Q Now, also, when you're talking about some of the rules, and I think the court was questioning you about Vito Badamo, I think you said was made in 2004, but you did not clear it. Is that correct?
A Correct.
Q Your approval wasn't given?
A That's correct.
Q Now -- and you -- I think you described this fellow,

Vinny Basciano, as the acting boss of the Bonnano family. Is that right?
A He made himself the acting boss; that's correct.
Q That's what I was about to ask you. You didn't -- he just took it upon himself to become the acting boss?
A That's correct.
Q But you were still exchanging messages back and forth?
A Not about no crimes.
Q I know. But were you still exchanging messages?
A Just telling him who he straightened out and who he made.
Q Okay.
Now, he was -- that would not comport with the rules of an organized crime family, and you were talking about structure here. For somebody who is not an acting boss -- or a boss or an acting boss to simply make himself acting boss. Is that correct?
A That's correct.
Q So when you're describing these rules about organized crime, they basically change depending upon the whim of whoever is that's acting. Is that correct?
A That's correct.
Q Now, George from Canada is one of the guys -- that was the murder that you were facing the death penalty on. Is that correct?
A That's correct.

Q You knew George from Canada?
A I made him my captain.
Q And you -- you knew him pretty well?
A I would say so.
Q Would it be fair to say that you were friends with him?
A Very close to him.
Q You thought the world of him?
A I certainly did.
Q You liked him?
A Yes, I did.
Q Right up until the moment that you had him killed?
A That's correct.
Q It was business?
A That's correct.
Q Now, George had a very lucrative drug business in Canada. Is that correct?
A I was not aware of that, I. Don't think it was in Canada, I think it was in New York.
Q But he was based in Canada?
A New York.
Q Well, he had been deported from Canada.
A He tried to become a citizen in Canada and they wouldn't accept it, so he stayed in New York. He used to go back and forth.
Q Okay. And so you're telling this jury that before you

had him murdered, you didn't know he was in the drug business?
A He got pinched --
Q That would be a yes or no.
A Yes/no. That's how I can answer that. He said he was innocent.
Q So you heard that he was in the drug business and you confronted him about it?
A I didn't confront him because at that time I was a captain. It wouldn't be in my position to confront him.
Q Okay.
Now, you did not have him killed to take his drug business, did you?
A No. I killed him because he killed a good fellow's son without my permission; that's why he got murdered.
Q Well, were you a boss when you decided to have him killed?
A Yes, I was the boss in '99.
Q And did you take over his drug business?
A No.
Q Who took over his drug business?
A I got no idea.
Q You have no idea. You're the boss of the family, you have him killed, and you don't know who took over his drug business?
A You got it right, Counsel. That's right, I don't know

who took over his drug business.
Q And all those millions and millions of dollars in cash and gold bars that you have in your house, that didn't come partly from the drug business?
A I never got a dime from the drug business.
Q So that all came from other criminal activity?
A Correct.
Q And you're telling this jury that you simply had him killed because he violated one of the rules of organized crime?
A That's correct. He killed a good fella's son, in the Bonnano family.
Q He had a pretty good reason for doing that, didn't he?
A I was in jail when he killed him.
Q But did he have a good reason for killing him?
A Not at all.
Q What was the reason?
A He said the guy beat up his nephew, and that doesn't warrant to kill somebody. This was in Canada.
Q Uh-huh.
Now, this other fella that you murdered, Joseph "Doo-Doo" Pastory, he was somebody that you were sort of partners in crime with him?
A I was partners in the cigarette business with him.
Q Did you commit any crimes with him?

A Yes, I did.
Q All right. So it would be fair to say you were partners in crime with him?
A One time.
Q And why did you kill him?
A I was asked by the Colombo family, it went to my boss. At that time I was an associate.
Q Now, do you -- So if somebody asked you, you're an associate of the Bonnano family and somebody says, why don't you go out and kill Doo-Doo Pastory. And Joe Massino's response is: Okay. Does that pretty much sum it up?
A He was my boss. If he told me to do it and I did it.
THE COURT: Who was your boss at that time? Who told you to do it?
THE WITNESS: At that time Phil Rastelli was the boss, but he was incarcerated.
THE COURT: Who got the message to you to do it, then?
THE WITNESS: That went to Nicky Glasses, he was the acting boss.
THE COURT: Okay. So the Colombo's come to.
THE WITNESS: Nicky Glasses, which was the underboss and acting boss.
THE COURT: And say they want this guy --
THE WITNESS: That he was a cooperator and they

couldn't get him.

THE COURT: Okay.

THE WITNESS: So he was my partner, your Honor, in the cigarette business.

Q Did you ever have any proof that he was a cooperator?

A It had nothing to do with me, it was the Colombo family that went to my boss. I did the favor; they asked me.

Q So it's like the murder of George from Canada, nothing personal, just business?

A Correct.

Q Now, the Vito Barrelli murder, same type of motivation behind that as well?

A That was Paul Castellano. He went to Nicky Glasses'. They asked for a favor -- no, excuse me. At that time it was Salvatore Catalano. He was acting boss of the Bonnano family, I believe in 1979, '80 --

Q But Mr. Barelli had the misfortune to have been dating Paul Castellano's daughter?

A That's correct.

Q And during the time that they were dating, he had made fun of her father?

A That's what I heard.

Q And apparently as soon as they broke up, she tells her father and he ends up whacked?

A That's fair to say.

Q And you were a participant in his murder?
A I was outside, yes.
Q And did you -- while you were doing these murders that somebody was asking you about -- asking you to do them, did you at any point in time think about the right and the wrong of it?
A There was no right or wrong. Because if I would have refused it, I would have got killed.
Q But you just said a few minutes ago, that basically the rules are, who's ever enforcing them. They get made up as they go along?
A Correct.
Q So if somebody didn't like you, you'd get whacked. If somebody did like you, then it didn't matter if you followed the rules or not?
A It happens all the time.
Q Okay.
Now, when you -- after that you were convicted of the seven murders, do you know what the guideline sentence range for those crimes were?
A Life.
Q So it wasn't going to be any surprise what your sentence was going to be when you were convicted of the seven murders?
A That's correct.
Q Now, did there come a point -- withdrawn.

When you started proffering with the government right after the jury verdict, was the attorney general -- was the decision of the attorney general to seek the death penalty against you, was that still in place?
A It wasn't in place at that time, it was up in the air.
Q Okay. But then at some point he made a decision that they should seek the death penalty?
A That's correct.
Q Fine. And then at a later point, after you continued to proffer, give information to the government, then the attorney general agreed with the prosecutors here, that they could pull the death penalty off the table. Is that correct?
MR. DENNEHY: Objection to the form, agreed with the prosecutors. Here or anywhere?
MR. McMAHON: Did the United States Attorneys Office, here in the Eastern District of York, make a recommendation to the attorney general to pull the death penalty off the table?
A Which attorney general?
MR. McMAHON: Of the United States of America.
A Which one? Ashcroft gave me the death penalty.
Q And the subsequent guy?
A Ashcroft retired. George Gonzalez came in, and he lifted the death penalty.
Q Okay. You were in the process of making a deal with the

government at that time?
A Correct.
Q And do you think the fact that you became a cooperating witness for them had anything to do with the attorney general changing his mind?
A When they first went to the attorney general --
Q Just answer my question.
Do you think the fact that you were in the process of becoming a cooperating witness for the US attorney's office, had anything to do with the attorney general's decision to change his mind?
A Absolutely.
Q That's all.
Now, the cooperation agreement which is in evidence as 3500JM1. Do you have a copy of that, sir?
A Not here.
Q The -- do you have it in your jail cell?
A No.
Q Do you have a copy of it anywhere?
A Yes, I do, but not here.
Q You have a storage depot for your records?
A No, I came from another institution. I didn't bring it with me.
Q Right. But you have it in your possession where you --
A Yes.

Q Okay. So you are fully familiar with it?
A Yes, I am.
Q Mr. McDonald is a good lawyer. And he went over the terms of it with you before you signed it?
A That's correct.
Q And it's an 11-page document, and it bears on the last page, and I think the prosecutor showed you, signature lines for three prosecutors, two defense lawyers, and yourself. Is that correct?
A Correct.
Q And if I could put the last page up on the Elmo. Now, that's your signature there on the bottom left of that?
A Yes, it is.
Q And Mr. McDonald signed on your behalf?
A Yes.
Q Signed as your counsel?
A That's correct.
Q Now, who is David Stern?
A He was another one of my lawyers.
Q And he was your death penalty counsel, wasn't he?
A That's correct.
Q He was a specialty on death penalty issues?
A Correct.
Q Trying to fight against the death penalty for you?
A Correct.

Q Now, he didn't even know that you were doing all these proffer sessions, did he?
A Yes, he did.
Q He did know?
A Correct?
Q How come he didn't sign it? Why didn't he sign off on this agreement?
A How would I know.
Q Well, he was your lawyer.
A He was at maybe three or four proffers, then I didn't see him no more.
Q All right. So who was your trial lawyer from the previous case on the seven murders where you were convicted?
A David Breitbart.
Q And he was kept in the dark that you were proffering with the government?
A That's correct.
Q For how long?
A Until it come out, I guess, in the court.
Q And that was not until next June of 2005?
A No, that was in February of 2005.
Q It came out that you were cooperating?
A Correct. It went in front of the judge. And I admitted to another murder with another case.
Q And you think that was in February of 2005?

A Yes.
Q Okay. So from -- from the end of July of 2004, until February of 2005, Mr. Breitbart was representing you on the death penalty case, not knowing that you were secretly cooperating with the government?
A No. Once I cooperated July 30th, that was the end of David Breitbart.
Q And then did you get a new lawyer?
A Yes.
Q Who was the new lawyer, other than Ed McDonald?
A That's it.
Q So you didn't have any other lawyer, other than Ed McDonald, from July of '05 -- from July of '04.
A Yeah.
Q And how about Mr. Stern?
A Well, he -- I had him. He showed up at a couple of proffers, but then he was gone. He was my lawyer in 2004.
Q Okay.
Now, the George from Canada indictment was -- came down in 2004?
A I believe so.
Q Now, the government asked you on direct examination about your obligations under the cooperation agreement, and I think you said your obligation was to tell the truth.
A Correct.

Q That's basically it?
A Everything I know.
Q And who decides if you're telling the truth?
A I guess the government.
Q Well, I don't want you to guess. I want you to tell the jury definitively -- let me get my question out. I don't want you to guess.
A Go ahead.
Q Do you know who decides if you're telling the truth?
A Well, I guess you got to get caught in a lie to not tell the truth.
Q That's one way of looking at it.
A Yeah.
Q But the agreement, does the agreement say who decides if you're telling the truth?
A I don't remember what it said.
Q We'll come to it.
Now, the first page of this agreement in paragraph one it lists some of the various crimes that you were convicted of at that first trial. Is that correct, sir?
A Correct.
Q And then on -- in paragraph two, on page two, it says that you're going to plead guilty to count nine of the new indictment; and that's an 03CR number. And that's the murder of George from Canada. Is that correct?

A Correct.
Q So the 03CR number means that that case was pending since the year 2003. Is that right?
A It's possible. I don't remember if it was three or four.
Q So you're looking at a murder, a separate life sentence on that. Is that correct?
A Right.
Q And as it turns out, you got a life sentence on that?
A Correct.
Q Now, going back to the first page. When the jury convicted you of the seven murders, did the jury also make a finding as to whether or not some of your monies were the proceeds of criminal activity?
A Correct.
Q And the jury found that there were at least $10 million?
A I think it was about 12.
Q Was ten -- Well, see on page two on the top, where it says 10,393,350, and then maybe some interest thrown in there?
A It's possible.
Q Okay.
Now, how much you would say, Mr. Massino, that you made from your life of crime? 100 million?
A Never.
Q 200 million?
A I want to say 25 million.

Q You gave the government ten, so you got 15 socked away?
A Through the years I had to live. You said through the years say you're talking about through the years.
Q So you spent 15 million in 20 years?
A Yeah, I gambled like crazy.
Q All right. So you made -- what would you say, 25 --
A Maybe. I couldn't put a figure on it.
Q It could be 50 million?
A No, definitely not.
Q Definitely not?
A No.
Q But you had the ability to go into your suitcase under the bed and pull out $10 million?
A Correct.
Q And give it to them?
A And it wasn't 10 million, it was about eight.
Q Eight. And then 2 million in gold bars?
A And then property.
Q And property?
A Correct.
Q Now -- and that was just skimming the surface of the Massino money.
A Excuse me?
Q That was skimming the surface of the Massino money?
A That was my money, yes.

Q But you had another 15, 20 million stored away?
A No.
Q Now, did the government take your word for it, that you didn't have another 15 or 20 million stored away?
A Counsel, if I had more money, I would have gave it to the government to save my property. Money is dead. It ain't going to do me no good. The real estate, you earn a couple of hundred thousand a year.
Q Well, perhaps you missed it, there was a real estate crash while you were in jail?
A Well, the market was up at the time.
Q Okay. So you'd rather have real estate than cash?
A It's dead money.
Q Did the government, let me go back to my question. Did the government take your word for it that you didn't have another 15 or 20 million?
A Correct.
Q They took your word for it?
A Yeah.
Q Now, when your wife showed up at the US attorney's office with 10 million in cash and gold bars, were you there?
A They didn't show up at the courthouse with money; they went and picked it up.
Q They went and picked it up from your wife?
A Correct.

Q At your house?
A Correct.
Q The million dollar house with the swimming pool in the back?
A Correct. How much was the house?
Q A million.
A That's fair to say.
Q And you got a nice swimming pool in the back?
A That's correct.
Q And your wife lives there?
A Correct.
Q She lives good?
A Fair to say.
Q Courtesy of these people here; the United States allowed her to keep the house?
A I paid my obligation. I paid the fine.
Q Did the United States Attorney's office make a deal with you that she could keep the house?
A Correct.
Q And your mother could keep her house?
A Correct.
Q And you could also keep another five properties?
A Correct.
Q And those five properties spinoff between 260,000 to $300,000 per year in rental income?

A I would say about 175, Counsel, 180.
Q Well, when you previously testified under oath it was 250 to 260?
A Yes, but I had another houses. I sold one of the houses since then.
Q Since you've been in jail and after you testified a year ago?
A Yeah.
Q You've been dealing in your real estate?
A Not me. It's not under my name. My wife sold a couple of pieces of property.
Q And took the cash?
A What else? What would you do with it? It's a check, not cash. It's a check.
Q Okay, she took a check?
A Correct.
Q By the way, when she gave the 10 million, some property, some gold bullion, was the 7 million in check or cash?
A Cash.
Q Cash. How many bags or boxes does it take to fill $7 million?
A I wasn't there.
Q But you're the one who stored it away?
A 100 percent.
Q And what was it stored in?

A Boxes.
Q Hundred dollar bills?
A Hundred dollar bills, correct.
Q Any larger denominations?
A Basically all hundreds.
Q Now, the government never executed a search warrant at your house, did they?
A No.
Q So they have no idea how much money is in your house, do they?
A Correct.
Q And it was only you telling them that it was 7 million cash and the gold billions?
A That's correct. If I had more cash, I would have gave it to them.
Q But I didn't ask that.
A Okay.
Q They didn't search to verify for themselves?
A Correct.
Q They took your word for it?
A Correct.
Q They were happy to make that deal with you?
A Correct.
Q Now, you -- let's say 25, let's pick the figure of 25 million. You know that you're supposed to pay taxes on

illegal -- illegally obtained money. In other words, if you make money from crime, you're supposed to pay taxes on it. Is that right?
A That's correct.
Q And you and your wife file joint tax returns all these many years?
A Correct.
Q And did you declare the $25 million in illegally obtained money?
A It wasn't 25 million.
Q Did you declare any of the money of your criminal activity on your tax returns?
A Not at all.
Q All right.
And did the government make you file amended tax returns, correcting your undeclared income in paying all of the penalties associated with underpaid income?
A No.
Q So you got a walk on the tax obligation?
A Correct.
Q Now, page five of the agreement paragraph six, it says: *the defendant will provide truthful, complete and accurate information, and will cooperate fully with this office, with the office.*
A That's correct.

Q And then on page six, in paragraph E, it talks about the properties and monies that are going to be forfeited, given to the government and what isn't. Is that correct?
A Correct.
Q So they -- they got the restaurant building, and they got, I think, four other properties. Is that right?
A Correct.
Q And you kept five or six properties?
A Correct.
Q And they got 7 million cash, give or take, and the gold bullion, and that was good enough for them. Is that right?
A Correct.
Q Now, you had some -- you had gold bars that were 1 ounce and 57 gold bars that were 5 ounces?
A I don't remember exactly, Counsel.
Q Well, it says it in the agreement there.
A I said I don't remember exactly, but that's what I had.
Q You were a gold collector?
A Yes.
Q And how many how -- many foreign accounts do you have?
A I ain't got any.
Q None?
A No.
Q Where did you store the rest of the 25 million?
A I didn't have 25 million. You said how much did I make.

Q Now, as part of the agreement in subparagraph C on page eight, United States Attorneys office will agree not to prosecute your wife or any of your daughters for money laundering. See that? That was part of your deal with them.

A Correct.

Q And money laundering is a crime punishable by up to 20 years in jail?

A Correct.

Q So you got a pass for your wife and daughter. Is that correct?

A I don't see why my daughters because my daughters didn't do anything.

Q Okay. But you -- this was negotiated, this agreement. Is that right?

A Correct.

Q Well, your daughters passed messages to you in jail?

A Not really.

Q Not really means *a little bit?*

A No, that means no.

Q It means no. So not *really* means no?

A Correct.

Q Are you telling me under oath, sir, are you telling the jurors that your daughters didn't pass messages to you from Vinny Basciano in jail?

A No.

Q Never happened?
A Not from Vinny.
Q From who?
A Maybe my partner, Alfred.
Q And he was what, an associate or a soldier?
A No, he was an associate in the Bonnano family.
Q So she passed messages from you to him, yes?
A Yes.
Q And it wasn't just hello?
A No.
Q But anyway, your lawyer saw fit to negotiate, as part of this agreement with the government on your behalf, immunity not only for your wife but also your daughters. Is that correct?
A That's correct.
Q Now, on paragraph eight, on page nine, the top there, the government told you that they reserve the right to meet with you without the presence of an attorney, without the presence of your attorney. Do you see that?
A That's correct.
Q And, in fact, they had many meetings with you where your lawyer wasn't present. Is that correct?
A That's correct.
Q Where it's just you and an agent and a prosecutor in a room?

A Correct.
Q And there's no recording device, is there?
A Correct.
Q You have any idea why the government insist on meeting with you without your lawyer there?
A I got no idea at all.
Q By the way, is your lawyer Ed McDonald, is he here in court today?
A I don't see him.
Q So you are relying on the government lawyers to be your lawyer?
MR. DENNEHY: Objection.
THE COURT: Sustained.
MR. DENNEHY: What does that mean?
Q Do you know why your lawyer isn't here today?
A I got no idea.
Q All right. In paragraph nine of the agreement, the highlighted portion there. See where it says: Should it be judged by the office that the defendant has intentionally given false misleading or incomplete information, they get the right to tear up the agreement?
A Correct.
Q Now, when it says the office, it means the United States Attorneys office for the Eastern District of New York?
A I believe so.

Q Okay. So it's not a jury that decides if you're telling the truth or it's not a court, it's the prosecutors?
A Correct.
Q The ones who put you on the stand. Is that right?
A That's correct.
Q And they get to decide whether you're being truthful?
A Correct.
Q And if you're -- If they decide what you have to say is truthful, then you get more benefits. Is that right?
A I hope so.
Q And if they decide what you have to say isn't truthful, then they're not going to follow through and you're not going to get the light at the end of the tunnel. Is that right?
A That's correct.
Q Now, you said you talked a little bit about this Rule 35. Rule 35 motion allows somebody like yourself who is serving a life sentence, life, in fact, two life sentences. A Rule 35 motion is only made by the government. Is that right?
A I believe so.
Q And it authorizes the court, it allows a court to sentence you anything down to time served. Is that correct?
A I believe so.
Q It doesn't require a court to do it, but it allows a court to do it. Is that right?
A Correct.

Q And did the government already make a Rule 35 motion for you?

A Not that I'm aware of.

MR. McMAHON: May I approach the witness? 3500JM7.

MR. DENNEHY: May we approach?

THE COURT: Yes.

(Sidebar begins.)

(Continued on the next page.)

Q Mr. Massino, did you look at the document I provided to you?
A Yes.
Q And doesn't that document mean, in essence --
MR. DENNEHY: Objection.
MR. McMAHON: All right, withdrawn. Judge, I offer the document in evidence.
MR. DENNEHY: No objection.
THE COURT: All right, the document will be received.
MR. DENNEHY: I can't hear you, your Honor.
THE COURT: It's been received. There has been no objection. What is the exhibit? 3500 what?
(Government's Exhibit 3500JM-7 received in evidence.)
MR. McMAHON: JM -- what's the number, Mr. Massino?
A I think seven, 3500JM7.
Q Okay. May I have the document back.
Now, excuse me, this is a two-paged document. Is that correct, sir?
A Yes.
Q And the first page is dated June 28, 2005. Is that correct, sir?
A That's correct.
Q And this is dated five days after your cooperation

agreement. Is that correct, sir? Here, I'll show you the last page of your cooperation agreement. Do you see June 23?

A Correct.

Q All right. So five days later this letter document, which is 3500JM7, is sent to Judge Garaufis of this court, and it says in the first paragraph: *Pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure, the government files this motion in the above entitled matters, and further respectfully request that the Court hold this motion in abeyance until such time as the government submits a supplemental letter outlining the extent of Mr. Massino's assistance to the government, if such a letter is warranted.*

Now, do you understand, sir, that this letter, which is now 3500JM7, basically tells -- Judge Garaufis was your sentencing judge. Is that right?

A Correct.

Q He gave up two life sentences?

A Correct.

Q On June 23, 2005?

A Correct.

Q Now, this letter says that *we make this application but we don't -- we, the government -- don't want you to act on it until we send in a supplemental letter, if we ever do.*

Is that correct, sir?

A Correct.

Q Now, has the government sent in a supplemental letter yet?
A Not that I know of.
Q And they are awaiting to see how your cooperation goes. Is that correct, sir?
MR. DENNEHY: Objection to the form of the question.
A I got --
Q Have you been told by your lawyer that the letter was sent?
A This letter?
Q No. That the government sent a supplemental letter outlining how much assistance you've given the government?
A No, I don't know nothing about it.
Q So you are basically on a leash with the government until they send that supplemental letter. Is that correct?
MR. DENNEHY: Objection to the form of the question.
THE COURT: Sustained.
Q Now, if the Rule 35 motion is granted, you could get anything from time served to no reduction at all. Is that right?
A I believe so.
Q But if they don't send that supplemental letter, it's just life?
A Correct.
Q All right. Going back to the cooperation agreement, page

nine, as we talked about, it's the US Attorney's office that decides if you're telling the truth. And if they decide that you're not telling the truth, then you don't get to take back your plea of guilty to the murder of George from Canada and they don't have to write any supplemental letter. Is that correct?

A Correct.

Q And there's one other provision in that cooperation agreement from June 23, 2005. *If the defendant breaches this agreement, this office, the US Attorney's office, may request that the defendant be removed from the witness security program.*

Do you see that?

A Yes, I do.

Q So basically they are telling you that if we tear up your agreement, we're putting you back in general population and you're going to get killed?

MR. DENNEHY: Objection to the form of the question.

THE COURT: Yeah, I'll sustain the objection to the form of the question.

Q Tell the jury what does that paragraph -- what are the practical implications?

A Well, I got to believe that if they throw me out of the program, I'll be locked down, probably ADS. I wouldn't be in general population.

Q Okay. But certainly your life would be a little bit more in jeopardy.
A I never thought of that.
Q But it's here in your agreement?
A Yeah.
Q It's a little bit of a club to hang over your head?
MR. DENNEHY: Objection to the form of that question.
THE COURT: Sustained.
Q Now, when you entered into your cooperation agreement with the government, was part of your motivation in making that decision what you knew about how other previous cooperators had been treated?
A No, not at all.
Q So you're telling this jury under oath, that you didn't do any checking to see what were the benefits of cooperation?
A No, not at all, Counselor.
Q You didn't do any due diligence?
A No.
Q You're the guy who puts DEA agents and cops on the payroll. You come out of your house and you look up at the door, and you make a decision like whether to cooperate or not without checking on how courts treat a cooperator?
A At that point I didn't care.
Q Why? Because you wanted to do the right thing?

A No. My concern was my wife and my mother; they were going to throw them in the street.
Q So you cut a deal with them?
A I flipped.
Q You cut a deal with them?
A Well, if that's what you want to say it is.
Q You became a rat?
A Correct.
Q Now, when you were sentenced on June 23rd, one of the things that the prosecutor told the judge, and see if you recollect this, 3500JM5, page two. Did he state to the court in your presence --
MR. DENNEHY: Objection to the relevance of that.
THE COURT: Yeah, I'll sustain the objection.
Q We had a conversation before about whether the -- your cooperation played a part in the attorney general's decision not to seek the death penalty. Remember those questions?
A Yes, I do.
Q That subject came up during your sentencing, did it not?
A Correct.
Q And, in fact, so that there was no -- no dispute, the prosecutor told you --
MR. DENNEHY: Objection.
THE COURT: I'll sustain. Can I see you at side bar, please.

MR. McMAHON: Sure.

(Side bar begins.)

(Continued on the next page.)

Q Do you read the newspapers, Mr. Massino, in jail?
A Yes, I do.
Q And you are aware, from your own trial, that your brother-in-law was a cooperator?
A Correct.
Q And in or around October of 2010, did you become aware of what your brother-in-law, Sal Vitale, was sentenced to?
A I think so.
Q Time served?

MR. DENNEHY: Objection. We just said --

THE COURT: Yeah, overruled. Do you know -- and I'll ask the jury to disregard counsel's statement. Do you know -- do you remember what his sentence was?

THE WITNESS: I don't know if he got sentenced or he's out on bail.

MR. DENNEHY: Move to strike the question and the answer and the comment.

MR. McMAHON: What he knows judge is that his brother-in-law --

THE COURT: Do you know that your brother-in-law is -- do you think your brother-in-law is no longer in prison?

THE WITNESS: Yes, I do believe that.

THE COURT: And you don't know whether that's as a result of his sentence or whether as a result of the fact that he got bail pending his sentence?

THE WITNESS: See, Counsel, other people that testified against me, they're out on bail.

THE COURT: So you don't know why it is. You know he's no longer in prison?

THE WITNESS: Correct.

THE COURT: You're not sure whether it's because he's on bail or because he got time served?

THE WITNESS: Correct. I believe he got time served.

THE COURT: Okay.

BY MR. McMAHON:

Q And his was, I think you said, 12 murders, I think you said.

A I don't know. I think so.

Q Okay.

Now, with regard to -- Was all of your money hidden in your house, sir?

A Yes.

Q All of your criminal proceeds?

A Correct.

Q And you're sure of that?

A Yes.

Q Well, do you remember telling Special Agent Kimberly McCaffey, and Special Agent Steve Colello, that in October of 2007, that you had money stashed in various locations,

including your attic, your mother's house, your sister-in-law's house, your best friend's house, and other places?
A No, I remember my mother's house.
Q You don't remember telling the agents that?
A No, I don't recall.
MR. McMAHON: May I approach, your Honor, again, and hand the witness document 3500JM21, page 60?
A Yes, I do recall.
Q Okay. And, now, you testified at the Basciano trial, that all the money was in your house. Is that correct?
A At that point, correct.
Q And so was that a mistake or was what you told the agent the mistake?
A No, it wasn't a mistake. It was at times where I did have money in these places, through the years.
Q All right. And when -- Now, that interview, with the agents, does that refresh your recollection, you did tell them that?
A Yes.
Q In August of '07?
A Correct.
Q And you told them that that's where you currently in '07, had money hidden?
A Prior. Not then.

Q When did you move it?
A I think just before I got pinched.
Q You knew you were going to get pinched, by the way?
A Yes, I did.
Q So you're sure you moved all the money to your house or did you move it somewhere like overseas?
A No, I got no money overseas.
Q But you were moving your money around just before you got pinched. Is that right?
A That's correct.
Q Now, I believe you were asked some questions about knowing a gentleman by the name of Nicky Santorra?
A Correct.
Q And he's somebody that was in your Bonnano family?
A Yes, I straightened him out.
Q Okay. Would you -- would it be fair to say that Mr. Santora, Mr. Nicky Santorra is a scam artist who never paid anyone?
A That's correct.
Q And that -- and that he would frequently lie about things. Is that correct?
A I wouldn't say he would lie. He just didn't pay anybody.
Q All right. Well, he lied about whether he was involved in the three captains murder, didn't he?
A Yes, he did. He bragged that he was there and he killed

them. Correct.
Q And he wasn't there.
A He had nothing to do with it.
Q And that would be called -- is it fair to say, that's a stone cold lie?
A 100 percent.
Q Probably not the first lie Nicky Santora ever told?
A Probably not.
Q But in any event, he's a scam artist; never paid anyone?
A Correct.
Q Now, do you know a gentleman by the name of Barbieri?
A What's his name?
Q Jimmy The General?
A Yes.
Q And is he in the Bonnano family?
A Yes. I made him; he's a wiseguy.
Q And he's a guy that --
MR. DENNEHY: Objection.
THE COURT: Yeah, I'll sustain the objection as to the relevance of this inquiry.
Q Now, do -- would it be fair to say, Mr. Massino, that mob members often lie to each other?
A It's a way of life in the mob, yes.
Q And they do it because whoever is speaking may have a different angle or a different agenda that they're pursuing.

Is that correct.

A That's fair to say; they've got motives.

Q And when you were -- you, in fact, lied to the boss of your family, when you were asked whether or not you murdered Tommy Zelma. Is that correct?

A I was never asked if I murdered him.

Q Did you tell them that you didn't murder him?

A Never asked if I did.

Q Didn't you have a conversation with him about -- didn't he call you in and say, if you were involved in the Tommy Zelma murder, it wasn't authorized, and you could be killed for that?

A He says, when I find out whoever did it, I'm going to kill him. He was asking about a guy by the name Anthony Dedona.

THE COURT: Excuse me. When you say he was asking, who is *he*?

THE WITNESS: Excuse me, your Honor. Phil Rastelli, the boss of the Bonnano family. He says, *I heard that Anthony Dedona killed Tommy Zelma. If you know anything, tell me. Because I went to the commission; and if I find out, I'm going to kill him.*

And I said, *I didn't know knowing.*

Q But you did know?

A 100 percent.

Q Okay. So you lied?
A Yes.
Q And you lied to the boss of your own family?
A That's before I knew him; this was in '68. I didn't get to meet him until four years later.
THE COURT: Before you knew who?
THE WITNESS: Phil Rastelli.
In other words, I was a nobody in '68. I was by myself. When we got involved, we copped a sneak, and we killed this guy. And then in '72 I meet the boss of the Bonnano family; and he mentioned about Anthony Dedona, because he knew he was my partner at one time in the cigarette business, then I wasn't his partner anymore.
Q But the question is: Did you lie to Rusty Rastelli in 1972 or 1973?
A That's correct.
Q And at the time that you did that, you were what, a soldier or an associate?
A I was -- at the time when I did it?
Q Yeah.
A I just got to meet him. I would say associate.
Q Okay. But associates aren't supposed to lie to bosses, either, are they?
A Correct.
Q And you did?

A Yes.
Q Knowingly?
A Correct.
Q Because mob guys lie all the time?
A 100 percent.
Q And finally, you have testified about antique, Mr. Romanello. And I think you were asked by the government to identify him.
A Correct.
Q And you looked over in the courtroom?
A Correct.
Q And you, having gone through a lengthy trial, know where, general idea where a defendant sits in the courtroom?
A Where he sits?
Q Yeah, where any defendant sits in the courtroom, such as this.
A Yeah, they all sit over there.
Q Okay.

Now, do you remember not that long ago being shown 260 pictures by agents of the FBI?
A How many pictures?
Q 260.
A I don't know how many pictures. I didn't count them.
Q And -- do you remember -- but you remember at various times --

A A bunch of pictures, correct.
Q Okay.
And do you remember being shown a picture of a gentleman -- withdrawn.
MR. McMAHON: May I approach and show the witness a picture?
THE COURT: Yes.
MR. McMAHON: It's 3500JM21, pages 235 through 241 and 452.
Q Do you remember being shown this picture, as part of the 260 pictures, in March of 2009?
A I don't know when I seen this picture.
Q And you were not able to identify that picture as Anthony Romanello in 2009. Is that correct, sir?
A If I seen it, I would have recognized it.
Q Yes.
Well, take a look at this document, 3500JM21, Bates number 239, and the picture is 213, and you were unable to identify it.
THE COURT: Is that a question.
Q Yes. Does that refresh your recollection --
THE COURT: Are you saying that that refreshes your recollection, that you were not able?
Q To identify that picture as Anthony Romanello?
A Was it this picture?

Q Yes.
A I don't recall.
Q You don't recall.
Now, that picture looks awfully similar, looks awfully similar to the picture --
MR. McMAHON: Do you have the government exhibit here?
Q This is Government's Exhibit 10. You were shown this picture in court. Is that right?
A Today? Yes.
Q Yeah. Is this not identical to the picture that I just showed you at Bates number 452?
A It's identical.
Q So when you -- when you are shown 260 pictures in March of '09, you can't even pick out Anthony Romanello. But after a few prep sessions with the government, which has you on a leash, you're able to identify ---
MR. DENNEHY: Objection to that. Objection to that.
THE COURT: Sustained and withdrawn.
MR. McMAHON: Nothing further.
THE COURT: I'll ask the jury to disregard the question.
MR. McMAHON: Nothing further.
THE COURT: The objection is sustained. I should also tell you, ladies and gentlemen, that questions alone that

lawyers ask are not evidence. It's the witness's answer to the question that becomes evidence. So the questions themselves do not contain evidence.

You have nothing further?

MR. McMAHON: Nothing else.

REDIRECT EXAMINATION

BY MR. DENNEHY:

Q Did anyone tell you who to identify in this courtroom?

A Not at all.

Q Anybody tell you what to say on the stand?

A Not at all.

MR. DENNEHY: I have no other questions.